STATE of Missouri, Plaintiff–
Respondent,

v.

Tamara J. HOLMAN, Defendant–
Appellant.

No. 28022.

Missouri Court of Appeals,
Southern District,
Division Two.

Aug. 3, 2007.

Frederick J. Ernst, Kansas City, for
Appellant.

Jeremiah W. (Jay) Nixon, Attorney General Mary H. Moore, Assistant Attorney
General, Jefferson City, for Respondent.

PHILLIP R. GARRISON, Judge.

Tamara J. Holman ("Defendant") was
convicted following a bench trial of two
counts of the class C felony of stealing,
violations of Section 570.030.[1] On appeal,
Defendant argues that her convictions
were not supported by sufficient evidence.
We affirm.

Viewing the evidence in the light most
favorable to the trial court's verdict, the
record reveals the following. Defendant
was elected in 1995 to serve as clerk for
the South Morgan Township (the "Township"), and served in that position until her
resignation on December 9, 2004. Defendant's husband, David Michael Holman
("Husband") was elected in 1995 to serve
as a board member for the Township, and
served in that position until his resignation
in 2004. In 2001, both Defendant and
Husband took over the duties of trustee of
the Township from Harold Dunn ("Dunn").
In that capacity, they were entrusted with
the Township's finances and equipment,
and the maintenance of the Township's
roads. From 2002 through 2004, Defendant wrote checks from the Township's
account to herself or Husband, in varying

---

1. All statutory references are to RSMo Cum.
Supp. (2002), and all rule references are to

Missouri Rules of Criminal Procedure (2006),
unless otherwise indicated.

amounts, purportedly for reimbursement of expenses; compensation for labor performed; and compensation for the performance of their official duties.

In 2004, Defendant turned over the Township's records, which included the Township's checkbook and bank statements, to Larry McGuire, the Dade County Clerk. At some point, Dade County Deputy Max Huffman ("Deputy Huffman") was asked to investigate the Township's financial records and obtained copies of the Township's checks and bank records. Seeing that the records were incomplete and inconsistent, Deputy Huffman called Defendant and arranged a meeting to go over some omissions and discrepancies.

At that meeting, Defendant told Deputy Huffman that she did not know the title of her official position with the Township, but it was her duty to take care of the checking account and the books. Defendant was not sure of Husband's title either, explaining that "they had just started doing things that needed to be done after [ ] Dunn had passed away." Defendant said that she "took care of the checkbook," and Husband "always signed the checks." Deputy Huffman went over the financial records with Defendant, asking her to explain the many checks written to either herself or Husband, as well as the many discrepancies and omissions in the financial records.

The investigation into the Township's records led to Defendant being charged with two counts of stealing, violations of Section 570.030. Count I alleged that Defendant appropriated funds from the Township's checking account between Feb-

ruary 1, 2002, and December 31, 2003, without consent or by means of deceit, in amounts between $500 and $25,000. Count II alleged the same conduct occurred between January 1, 2004, and December 31, 2004.

The case proceeded to a bench trial, at which Deputy Huffman testified regarding checks written from the Township's account to Defendant and Husband between February 1, 2002, and December 31, 2004. Deputy Huffman's testimony regarding those checks and his conversation with Defendant reveals, in relevant part, the following.[2]

For the year 2002, checks numbered 1695, 1710, 1711, 1712, 1713, 1714, 1715, 1716 and 1718 were written by Defendant and made payable to Husband for varying amounts. Check number 1695 was for $300, and the memo portion of the check indicated "Trustee for 2001." Defendant explained that the check was for Husband's trustee fee for 2001.

Check number 1710 was in the amount of $252, and the memo portion of that check indicated that it was for "[b]rush cutting and road work." Defendant explained that the check was for "2002 Road District tractor fuel and labor." The check stub for the check read "brush cutting."

Check number 1711 was for an amount not disclosed by the record, and the memo portion of the check indicated that it was also for "[b]rush cutting." Defendant said that it was for "Road District, tractor fuel and labor."

---

2. As the appellant in this case, it is Defendant's duty to compile the record on appeal which should contain all of the exhibits and evidence necessary for this Court's determination of the questions presented. Rule 30.04; see State v. Hackler, 122 S.W.3d 132, 135 (Mo.App. S.D.2003). While the checks in question were apparently admitted as exhibits at trial, Defendant has not provided this Court with those exhibits. However, because Deputy Huffman testified extensively regarding the checks at issue, we will rely on that testimony in attempting to review Defendant's contentions of error.

Check number 1712 was written for $236, and the memo on that check and the corresponding check stub indicated that it was "for repair work." Defendant said that the check was for "road work."

Check number 1713 was in the amount of $152 and the memo portion of the check indicated that it was for "[b]rush cutting." The corresponding check stub was dated August 21, 2002, and indicated that the check was "to Dodd's Service for diesel repairs for $152." Defendant said that the check was for road work.

Check number 1714 was in the amount of $450, and the memo portion of the check stated it was for "cutting brush, hauling rock, and trustee money." Defendant said that she had written the check to Husband for "brush and rock hauling and [Husband's] trustee's fees." Defendant did not have any documentation for the trustee's fees, but explained that she calculated the fees as three percent of "what they collected." The corresponding check stub made no mention of trustee fees.

Check number 1715 was in the amount of $112. The memo portion of the check indicated that it was for "brush cutting," but the check stub indicated that it was for "Diesel at Dodds[.]" Defendant said it was for hourly work of some kind.

Check number 1716 was in the amount of $103.23, and the memo of the check indicated that it was for "labor, gas, etc[.]" Defendant said that the check was for fuel and gas, and the check stub said that it was for brush cutting and ditches.

Check number 1718 was in the amount of $210 and the memo indicated it was for "[l]abor and road work." Defendant said it was for labor, but did not have any records for the time worked by Husband. The corresponding check stub indicated that the check was payable to "Purinton's" for "winterizes tractor."

For the year 2003, checks numbered 1723, 1727, 1729, 1730, 1732, 1733, 1739 and 1740 were written by Defendant and made payable to Husband for varying amounts. Checks numbered 1728 and 1742 were written by Defendant, but made payable to herself. Check number 1723 was in the amount of $164.22, and the memo portion of the check indicated that it was for "Trustee money for 2002." The corresponding check stub stated that it was "for rock" and did not indicate an amount. Defendant explained the discrepancy by saying that "she had changed her mind on the stuff[.]"

Check number 1727 was in the amount of $1,204.36, but the memo did not indicate what the check was for. While the check was payable to Husband, the corresponding check stub indicated that it was made payable to Dadeville Road for taxes in the amount of $2,404.27. Defendant said that the check was for "accumulated work, brush hogging and diesel, using the Road District tractor[,]" but provided no records of such.

Check number 1728, made payable to Defendant, was for $610, and the memo simply read "trustee." Defendant said that the check was for trustee fees, which she calculated as "[three] percent of everything I deposited and so much for each pay period." Defendant did not have any records for her calculations. Written on the check stub was "payable to [Defendant]" and "clerk."

Check number 1729 was in the amount of $507, and the memo portion of the check indicated that it was for "Labor, 41 hours cutting and hauling." The corresponding check stub indicated that it was for "tractor repair, for cutting and diesel and brush." Defendant said that the check was for labor and fuel, but she did not have any records regarding the labor, such as time cards.

Check number 1730 was in the amount of $527, and the memo line stated that it was for "labor on tractor and roads." The corresponding check stub stated void, but the check was endorsed by Husband and cashed.

Check number 1732 was in the amount of $76.21, and the memo line and corresponding check stub indicated that it was for tractor repair. Defendant said it was for tractor repairs, parts and labor, but she did not have any receipts.

Check number 1733 was for $347.25, and the memo line indicated that it was for "[l]abor for tractor and brush cutting." The check stub showed that the check was written to Purinton's, but did not say for what purpose.

Check number 1739 was for $411.16, and the memo line indicated it was for "[c]utting brush, digging and cutting out tin horns." Defendant explained that it was for fuel and for Husband's labor to run the tractor, but she did not have any receipts or records. The corresponding check stub stated that the check was for "diesel and repair on the tractor."

Check number 1740 was written in the amount of $472.64, and the memo line indicated that it was for "cleaning ditches, labor and gas." The corresponding check stub stated "Void," even though the check had been cashed and endorsed by Husband.

Check number 1742, was written by Defendant to herself in the amount of $481.63, and the memo line said "Trustee-clerk." The corresponding check stub was marked "Void." Regarding the trustee-clerk fee calculation, Defendant explained, "I just calculated 50,000 for the year and all document fees. I wrote the check and [Husband] signed it."

For the year 2004, checks numbered 1744, 1746, 1747, 1748, 1751, 1753, 1754 and 1755 were written by Defendant and made payable to Husband or Defendant for varying amounts. Check number 1744 was written on January 7, 2004, for $834 to Defendant and the memo line indicated the payment was for "[p]apers, fill out and trustee." Defendant said that she paid herself trustee fees as allowed by statute and she calculated that amount at "[three] percent for all receipts." The check stub and check register relating to check number 1744 were both blank.

Check number 1746 was made payable to Husband in the amount of $321.67. Defendant stated that Husband "signed the check and [she] wrote it. It was for both of [them] cleaning ditches. We both endorsed the check." The memo line on the check stated it was for "[l]abor," but the check register entry for this check was blank. The check was endorsed by both Husband and Defendant.

Check number 1747 was made payable to Defendant in the amount of $346.21 for "bookkeeping." Defendant said that the check was "for out-of-pocket expenses. [She did not] have any records or worksheets. [She] just didn't keep any. [She] wrote the check and [Husband] signed it." The check register indicated that the check was made payable "to the Dadeville Road" for "[t]axes." Defendant was unable to explain this apparent discrepancy to Deputy Huffman.

Check number 1748 was made payable to Defendant "[f]or bookkeeping and ditch cleaning" in the amount of $821.42, on March 12, 2004. Defendant explained that this check was for "ditch cleaning, piling brush and clean up [sic] of ditches before grading. It did not cover any bookkeeping. It was figured at $8 per hour for each of [them]." The check was endorsed by Defendant and the accompanying check register entry was "completely blank."

Check number 1751 was made payable to Husband in the amount of $894. The memo line on the check indicated it was for "[l]abor" and the check was endorsed by Husband. Defendant stated that the check was "for brush hog and spraying . . . and fuel." The check register indicated the check "was payable to [Husband] . . . for helping Allen work roads." Defendant said she did not have any receipts relating to this check. Defendant was unable to explain to Deputy Huffman the discrepancy in the memo line and in the check register notation.

Check number 1753 was made payable to Defendant in the amount of $325 and was signed by Husband. The memo line indicated the check was for "[p]icking up brush and hauling brush." The coordinating check register was empty of any notations relating to this check except that it indicated the check was for $225 instead of $325.

Check number 1754 was made payable to Husband in the amount of $862.40. The check, which was signed by Husband, stated it was for "cutting brush and tractor tires." The check register contained no notations relating to this check. There were no corresponding receipts.

Check number 1755 was made payable to Husband and signed by Husband. The check was executed in the amount of $327.41, and set out it was for "[d]igging tin horns." Defendant explained that the check was "figured . . . at $10 per hour, labor, diesel and tractor." The check register for this check indicated its amount, but no other notations.

Deputy Huffman testified that in his review of the Township financial records it appeared that "[i]n 2002, the accounts

seemed to be fairly complete or kept up complete in the check stubs and check register. As it continued on in 2003 and 2004, there . . . [were] more entries missing, totals were not carried forward, entries were not made at all." He stated that as time passed the number of checks written directly to Defendant and Husband "increased significantly, as well as the amounts of the checks."

Husband testified at trial, and admitted that in 2003 the Township received $13,457 in total receipts and he and Defendant were paid $4,801. Husband acknowledged that the total receipts for the Township in 2004 were $7,344.49, and he and Defendant were paid $5,702.11 during that year.

The trial court found Defendant guilty on both counts of stealing.[3] The trial court suspended imposition of sentence on Count I and suspended execution of a two year prison sentence on Count II, which resulted in Defendant being placed on probation for five years. This appeal followed.

In her sole point on appeal, Defendant argues that the trial court erred in overruling her motion for judgment of acquittal at the close of the State's evidence and at the close of all evidence, because there was insufficient evidence to support a finding that Defendant was guilty beyond a reasonable doubt for both counts of stealing. Defendant argues that "the evidence did not establish that [she] intentionally took any money without consent or by deceit, or that she did not honestly believe that she had a right to the payments." We find that there was sufficient circumstantial evidence showing that Defendant took money by deceit, thereby supporting a conviction for stealing.

**3.** Defendant and Husband were tried together. However, Husband appeals his conviction tions separately.

The same standard of review applies to criminal cases tried by the court without a jury as in cases tried by a jury. *State v. Mace*, 203 S.W.3d 254, 256 (Mo.App. S.D. 2006). Under our standard of review, we must determine whether or not there was sufficient evidence from which the trier of fact could have reasonably found guilt. *Id.* In doing so, this Court does not weigh the evidence, but accepts as true all evidence tending to prove guilt together with all reasonable inferences that support the verdict, and all contrary evidence and inferences are ignored. *Id.* We examine the elements of the crime and consider each in turn. *Id.* "The credibility and weight of testimony are for the fact-finder to determine. The fact-finder may believe all, some, or none of the testimony of a witness when considered with the facts, circumstances and other testimony in the case." *State v. Crawford*, 68 S.W.3d 406, 408 (Mo. banc 2002) (internal citation omitted).

To be convicted of the class C felony of stealing under Section 570.030, one must: (1) appropriate the property of another, (2) which has a value of at least $500, (3) with the purpose of depriving him thereof, and (4) without his consent or by means of deceit or coercion. "Deceit" is defined by Section 570.010(7), in relevant part, as "purposely making a representation which is false and which the actor does not believe to be true and upon which the victim relies, as to a matter of fact, law, value, intention or other state of mind."

Drawing all reasonable inferences in favor of the verdict reached, there is sufficient evidence showing a pattern of deceit by Defendant in appropriating funds from the Township. From 2002 through 2004, Defendant wrote twenty-seven checks to herself or Husband out of the Township checkbook. For thirteen of those checks there were obvious discrepancies between the information on the check and what was written on the check stub or in the check registry. On three occasions, the check stub was marked "Void," even though a check had been made payable to Defendant or Husband and cashed.

Furthermore, as noted by Deputy Huffman, the record keeping became progressively inconsistent as time went on. Of the eight checks written to Husband or Defendant in 2004, six had no explanation for payment or payee information listed on the check stubs; one listed the wrong amount on the check stub; one contained a memo notation that it was to Defendant for "bookkeeping," but the check register stated it was "to the Dadeville Road" for "[t]axes"; one stub stated it was payable to Husband "for helping Allen work roads," but Defendant explained to Deputy Huffman that it was for tractor use, fuel, brush hogging, and spraying; and one stated it was for "digging tin horns," but Defendant told Deputy Huffman it was for labor, tractor use, and fuel. Only one of the eight checks was made out for a consistent amount, listed the same notation on both the memo line and the check stub, and was properly recorded in the check register. Also, as was set out previously, Defendant offered no documentation to support any of the payments to Husband or herself, and offered no explanation for the lack of documentation.

Defendant argues that "there was no evidence that incorrect notations in the check register were intended to or did deceive anyone." However, our standard of review dictates that we draw all reasonable inferences in favor of the verdict. We find that an intent to deceive can be reasonably inferred from the following: Defendant and Husband were entrusted with the Township's finances, yet failed to maintain accurate records of the Township's expenditures; many of the discrepancies in

the record pertained to checks written by Defendant to herself and Husband; Defendant could provide no documentation for the fees and reimbursements collected by herself and Husband; and the record-keeping became progressively inconsistent over time, especially pertaining to those checks written to Defendant and Husband.

 "Because the subjective intent of the defendant at the time of the commission of the crime is rarely open to direct proof, intent may be proven by circumstantial evidence." *State v. McMellen,* 872 S.W.2d 508, 510 (Mo.App. W.D.1994). Here, the circumstantial evidence adduced at trial was sufficient to establish Defendant's intent to deceive. The trial court did not err in overruling Defendant's motion for judgment of acquittal and in finding her guilty of stealing, because there was sufficient evidence to prove beyond a reasonable doubt that Defendant violated Section 570.030 by stealing funds from the Township by means of deceit. Defendant's point is denied.

The judgment and sentence of the trial court is affirmed.

LYNCH, C.J., and RAHMEYER, J., concur.